**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION**

| | |
|---|---|
| JAMES D. HARRAL, Jr., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )  Case No. 2:16-cv-0027-WTL-DKL |
| | ) |
| DR. ALUKER, *et al*., | ) |
| | ) |
| Defendants. | ) |

**Entry Denying Motion for Preliminary Injunction**

Plaintiff James Harral asks this Court to grant his motion for preliminary injunction requiring the medical staff at the Putnamville Correctional Facility ("Putnamville") to restart his bipolar and neuropathy medication. Mr. Harral alleges that the defendants removed him from his bipolar and pain medications and as a result he has had to endure extreme manic depressant episodes, such as withdrawal, insomnia, and mood swings. He also feels he needs to be isolated from the general population. He asks this Court to order the defendants to restart his medications to the same dose and frequency as he was taking prior to July 23, 2015.  The defendants responded to the motion for preliminary injunction. For the reasons set forth below, the Court **denies** Mr. Harral's motion for a preliminary injunction.

**A. Medication History**

In 2012, prior to his incarceration, Mr. Harral suffered a crush injury to his left arm, resulting in neuropathic symptoms from his elbow distally (toward his wrist). Mr. Harral's current doctor, Dr. Spanenberg, Site Medical Director at Putnamville, employed by Corizon, LLC., diagnosed him with mononeuropathy multiplex. More simply put, the crush injury damaged at least two nerves in Mr. Harral's lower left arm, resulting in some limited atrophy of his wrist and

the type of pain associated with damaged nerves – burning, tingling, and numbness. [dkt. 47-1, ¶ 7]. Mr. Harral also reported lower back pain, but x-rays taken on March 31, 2015, showed only mild L4-5 intervertebral disc loss. [Dkt. 47-1, ¶ 7; 47-2, p. 8]. In June of 2015, Mr. Harral was seen by Nurse Fuqua and reported anxiety, irritation, depression and lack of energy. [Dkt. 47-1, ¶ 19]. For his nerve pain and depression, Mr. Harral sought three specific drugs – Wellbutrin, Ultram, and Neurontin. [Dkt. 47-1, ¶¶ 14, 19, 51, 55-56]. All three of these drugs are highly abused. [Dkt. 47-1, ¶ 14].

Ultram is a synthetic version of an opioid medication and is a schedule IV controlled substance. Ultram is treated as a narcotic. [Dkt. 47-1, ¶ 8]. Like other narcotic medications, Ultram is abused. [Dkt. 47-1, ¶ 9].

Neurontin is one of several anticonvulsant medications used for the management of neuralgia or pain caused by damaged nerves. The Food and Drug Administration ("FDA") approved Neurontin for the management of nerve pain arising from shingles and for seizures. Though controversial, medical providers found Neurontin can be effective for other types of nerve pain. Neurontin is abused in the correctional setting because it can induce euphoria. There are several alternative anticonvulsants, such as Dilantin or Tegretol, which can be substituted for Neurontin without the same abuse issues. [Dkt. 47-1, ¶ 10].

Wellbutrin is heavily abused inside the correctional setting. When crushed and snorted, the user experiences euphoria and increased arousal. [Dkt. 47-1, ¶ 11].

Inside prisons, medical providers avoid prescribing the more abused medications if other medications are equally effective. If a medication known to be abused is prescribed, it can be given as "watch swallow" or crushed in water so a nurse can confirm the patient is taking the medication rather than "cheeking" it. Providers may also order random drug tests to confirm medication

2

ingestion. When a patient is found to be diverting medication or misusing it, the medication is terminated and alternative medications are tried. [Dkt. 47-1, ¶ 12]. Mr. Harral has been diagnosed with polysubstance abuse, demonstrated by multiple drug related convictions and Indiana Department of Correction ("IDOC") disciplinary proceedings for misuse of medications. [Dkt. 41-1, ¶ 7].

**B. Mr. Harral's Treatment**

In 2015, the IDOC removed Wellbutrin from the formulary. After that if a medical provider wanted to prescribe Wellbutrin, he or she needed to submit a request through Corizon's Utilization Management for approval. This extra step ensures providers first try alternative medications before requesting Wellbutrin. If a patient required Wellbutrin, however, it was available.

Because of Wellbutrin's removal from the formulary, Mr. Harral was taken off Wellbutrin and was prescribed an alternative medication called Remeron. On April 10, 2015, Mr. Harral requested Advanced Practical Nurse (APN) Dawson end Remeron due to "bad" side effects and restart Wellbutrin.  [Dkt. 47-1, ¶ 13; 47-2, pp. 20- 21]. Dawson offered other medications, but Mr. Harral became angry, threatened to file a lawsuit, and argued until she was forced to ask him to leave. He insisted "nothing worked but Wellbutrin." [Dkt. 47-1, ¶ 13; 47-2, p. 20].

On April 13, 2015, Nurse Practitioner (NP) Warren saw Mr. Harral for neuropathy in his left forearm. [Dkt. 47-2, p. 23].  At the time, he received ibuprofen 400 mg once a day; Tylenol 325 mg once a day; and a Neurontin 600 mg tablet, twice in the morning, once at noon, and twice at night, for pain management. Mr. Harral requested that NP Warren submit a non-formulary request for Ultram because he had already tried alternative medications and continued to experience arm and low back pain. [Dkt. 47-2, p. 23].  NP Warren noted that his most recent x-rays were negative, but she submitted a request to start Ultram and planned to consider trigger

3

point injections. [Dkt. 47-2, p. 24].  The Ultram was approved at one 50 mg tablet, twice a day. [Dkt. 47-1, ¶ 14; 47-2, p. 31].

On April 19, 2015, Behavioral Health evaluated Mr. Harral. [Dkt. 47-2, p. 28]. He was irritable and reported poor sleep and appetite. He wanted Wellbutrin and refused any alternative medications. He saw another mental health professional on April 30, 2015, and requested Wellbutrin again. [Dkt. 47-2, pp. 32-33]. He then refused the trigger point injection to address his chronic pain on May 1, 2015. [Dkt. 47-1 ¶ 16; 47-2 pp. 31, 150].

On May 15, 2015, APN Dawson saw Mr. Harral. [Dkt. 47-2, p. 38-40]. He continued to ask for Wellbutrin and refused all other medications. He also requested a mood stabilizer, but declined APN Dawson's proposals of lithium and Depakote. He agreed to try Lamictal if APN Dawson would move him to a different bed. When APN Dawson declined, Mr. Harral left the office stating he never wanted to see her again. [Dkt. 47-2, p. 38]. APN Dawson noted that Mr. Harral exhibited manipulative and drug-seeking behaviors. [Dkt. 47-1, ¶ 18].

On June 1, 2015, Mr. Harral saw NP Penni Fuqua for behavioral health management. [Dkt. 47-1, ¶ 19; 47-2, p. 41-43]. She noted Mr. Harral had tried several medications without success. He reported that he was sleeping little, his weight had dropped, and he was having trouble functioning. He reported anxiety, irritation, depression, and lack of energy. NP Fuqua noted to prescribe Wellbutrin if approved by Dr. Burdine. [Dkt. 47-2, p. 43]. She recommended one 100 mg tablet, twice a day, crushed and floated in water to avoid diversion. He wanted Wellbutrin, so he agreed to have it crushed and floated. This was approved. [Dkt. 47-1, ¶19; 47-2, p. 48].

On June 2, 2015, Mr. Harral requested that his Ultram dose be increased. [Dkt. 47-2, pp. 42, 151]. He reported that the medication had worked previously, but no longer. Dr. Alukar kept the prescription at one 50 mg tablet twice a day. [Dkt. 47-1, ¶ 20; 47-2, pp. 42, 169]. On June 3,

2015, Mr. Harral saw Dr. Alukar for back and hip pain. [Dkt. 47-1, ¶ 21; 47-2, pp. 48-49]. Dr. Alukar noted that Mr. Harral had back spasms in the L3 to L5 levels with a decreased range of motion. He prescribed Robaxin, a muscle relaxer. [Dkt. 47-2, p. 49]. Dr. Alukar then performed a corticosteroid injection on June 26, 2015, and obtained continued approval for Mr. Harral's Neurontin prescription. [Dkt. 47-1, ¶ 21].

On July 6, 2015, NP Warren saw Mr. Harral for left arm and hand neuropathy. [Dkt. 47-2 pp. 50-52]. He reported chronic pain, tingling, and numbness after a car fell on his arm, pinning it under a tire for twenty minutes. He did not suffer any broken bones. Mr. Harral reported good results on Ultram, but wanted it increased to two 50 mg tablets twice a day. He wore a glove for further pain control and requested a new back brace after his was taken away in segregation. [Dkt. 47-2, p. 50]. NP Warren requested an increase in the patient's Ultram to 100 mg twice a day, ordered him a compression glove, and provided a new back brace. [Dkt. 47-2, pp. 51, 153]. The increase in the Ultram was approved. [Dkt. 47-1, ¶¶ 22, 23; 47-2, pp. 52- 53].

On July 13, 2015, NP Fuqua met with Mr. Harral for medication management. He requested that his Wellburtin be increased. He reported feeling overwhelmed, anxiety, and paranoia with "minimal" improvement on Wellbutrin. NP Fuqua noted to request an increase in Wellbutrin. [Dkt. 47-1, ¶ 24; 47-2, pp. 56-58, 62].

On July 23, 2015, NP Warren entered the following administrative "note" into the medical record. A correctional officer received a tip that Mr. Harral and other inmates were diverting medication to sell. When staff shook Mr. Harral's cell down, the officer witnessed him take ten to twelve pills. Mr. Harral admitted that he cheeked his morning medications rather than swallowing, so he was given activated charcoal to protect against overdose and placed in observation for monitoring. Pursuant to IDOC and Corizon policy, medical staff ended his non life-sustaining

medications for six months which were the same medications he diverted: Neurontin, Ultram, and baclofen. [Dkt. 47-1, ¶ 25; 47-1, pp. 63-64]. Mr. Harral's prescription for Wellbutrin was also terminated. [Dkt. 47-1, ¶¶ 11, 26].

On July 28, 2015, Mr. Harral saw Dr. Byrd for neuropathy. He admitted to diverting the medications, but claimed he did so to handle breakthrough pain without the midday dose. He also stated that he bought pills on the yard. [Dkt. 47-1, ¶ 27; 47-2, pp. 69-70].

On August 26, 2015, APN Dawson saw Mr. Harral for evaluation after termination of the Wellbutrin. He reported a low mood and crying. APN Dawson offered Effexor, Prozac, Celexa, Zoloft, Pamelor, Tofranil, and Remeron, which are all effective medications for depression, but Mr. Harral refused them all. APN Dawson also noted that Mr. Harral refused Valpoic acid and lithium as mood stabilizers. [Dkt. 47-1, ¶ 30; 47-2, pp. 77-79].

On August 29, 2015, Mr. Harral wrote a letter to Fuqua. He apologized if he made Fuqua feel threatened or bullied. He then wrote as follows:

> Last month, I made the poor decision to bring my neuropathy meds back to the dorm to take a little later. Noon medications call out was ceased by Mrs. Bunch because they just fired an employee and didn't have the staff to run the pharmacy. Well, I have a [chronic] injury to my left arm that was being treated [three] times a day because it causes me a lot of pain [and] discomfort. Taking away noon meds was making the needle pain and numbness worse, so I brought my Neurontin and Ultram back [two] days in a row, but on the second day, I was told on and subsequently searched….

 [Dkt. 47-1, ¶ 32; 47-2, pp. 157-58].

On October 28, 2015, Mr. Harral saw Dr. Kiani. He reported that he was in pain all the time, but Dr. Kiani did not see any distress. Dr. Kiani elected to restart the Neurontin on November 5, 2015, at a lower dosage, 600 mg twice a day. [Dkt. 47-1, ¶ 35; 47-2, pp. 85-86, 90; 47-3, pp. 161, 164, 166].

On April 7, 2016, a correctional officer caught Mr. Harral passing Neurontin to another offender. The officer notified NP Finote, who discontinued the prescription. After Mr. Harral was found not guilty of passing Neurontin in a disciplinary proceeding, the prescription was reinstated at 600 mg tablet, twice a day. [Dkt. 47-1. ¶ 44; 47-2, pp. 107-08].

Dr. Spanenberg ordered Mr. Harral's Neurontin levels checked July 5, 2016. On July 9, 2016, the lab report returned showing that the patient's Neurontin was at non-therapeutic levels, which means he was not taking his medication. Mr. Harral's prescription for Neurontin was cancelled. [Dkt. 47-1 ¶¶ 46, 47; 47-3, pp. 117, 146].

On August 26, 2016, Dr. Spanenberg met with Mr. Harral, custody, and the HSA to discuss the patient's drug diversion issues and pain control. He admitted diverting Neurontin because other offenders had forced him to do so over a long period. His lab results confirmed that he was not taking Neurontin. Dr. Spanenberg would not reorder Neurontin as Mr. Harral was misusing the medication, but agreed to order Ultram for a few weeks while the medical staff worked through other options for pain control. [Dkt. 47-1, ¶ 50; 47-3 pp. 127-29].

More recently, in January of 2017, Mr. Harral was caught by correctional officers attempting to ingest several unknown orange squares. He tested positive for Suboxone, which is consistent with the orange squares he was seen ingesting. Suboxone is used to manage recovering opioid addict to prevent relapse. Like other opioids, Suboxone can cause euphoria and dependency. It is manufactured in a thin dissolvable filmstrip form and is not prescribed inside prison facilities. [Dkt. 51-2, ¶ 5].

Substance abuse and addiction to analgesic medications are manifestations of the brain changes caused by the drugs. The drugs bring intense pleasure. Ending abuse is physically difficult due to a craving for the addictive substance and the need to ward off withdrawal symptoms. When

taken off the medications, the patient may experience transient increases in pain with withdrawal symptoms. The treatment plan for such patients requires transition to rational polypharmacy (multiple medications) with non-narcotics, particularly antidepressants and anticonvulsants (avoiding addictive Neurontin in this patient's case). The process is not immediate – weaning off of addictive medications never is – it can take several months for the patient's body to physically adjust to functioning without the addictive substance. [Dkt. 47-1 ¶ 58].

In Mr. Harral's situation, his reported pain did not impact his physical function. He was able to perform his activities of daily living, work, and follow the rules of the facility – with the exception of medication compliance. Dr. Spanenberg and other providers conducted numerous physical examinations to assess objectively Mr. Harral's pain and its cause. While his examinations did reveal some nerve damage and slight narrowing of one lumbar disc, the examinations ruled out objective symptoms that correlated with his reported severe pain. Mr. Harral misused his medications and then lied to his medical providers when caught. It did not happen once, it happened multiple times. [Dkt. 47-1, ¶ 59]. Based on Dr. Spanenberg's extensive experience, Mr. Harral had all the hallmarks of a polysubstance abuser, seeking medication he did not need in order to abuse it. Providers do not prescribe addictive medications to patients with a substance abuse history. To do so renders the patient highly likely to relapse into drug addiction. [Dkt. 47-1 ¶ 60].

Giving addictive medications to a patient with a demonstrated history of noncompliance invites relapse with deleterious effect on his health. [Dkt. 47-1 ¶ 6].

## II. Preliminary Injunction Standard

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v.*

*Armstrong,* 520 U.S. 968, 972 (1997) (citation omitted). There are four requirements a movant must establish to be entitled to a preliminary injunction: (a) likely of success on the merits; (b) irreparable harm in the absence of preliminary relief; (c) the balance of equities tips in the movants' favor; and, (d) that an injunction is in the public interest. *Winter v. NRDC, Inc*., 129 S. Ct. 365, 374 (2008). The "movant has the burden to show that all four factors . . . weigh in favor of the injunction." *Davis v. Pension Benefit Guar. Corp.,* 571 F.3d 1288, 1292 (D.C. Cir. 2009). "If the court determines that the moving party has failed to demonstrate any one of these [ ] threshold requirements, it must deny the injunction." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S.A., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008).

### III. Discussion

Mr. Harral has failed to establish his right to injunctive relief. Mr. Harral has not shown that he is likely to succeed on the merits of his claims or that he will suffer irreparable harm if immediate relief is not granted.

#### A. *Likelihood of Success on the Merits*

The defendants argue that Mr. Harral is not entitled to a preliminary injunction because he has not shown a likelihood of success on the merits of his claim. Mr. Harral's claim is brought pursuant to 42 U.S.C. § 1983. To state a valid Eighth Amendment claim for inadequate medical care, Mr. Harral must "allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (U.S. 1976). A deliberate indifference claim is comprised of two elements: one objective and one subjective. *McGee v. Adams*, 721 F.3d 474, 480 (7th Cir. 2013). The defendants do not dispute that Mr. Harral suffers from a serious medical condition. To establish the subjective element, Mr. Harral must

show that the defendants were aware of his serious medical need and were deliberately indifferent to it. *Id.*

Here, Mr. Harral disagrees with his medical care and the decisions about the medicine he was being (or not being) prescribed. A dispute about his proper course of treatment does not state a claim of deliberate indifference. "Under the Eighth Amendment, [the plaintiff] is not entitled to demand specific care. [H]e is **not entitled** to the **best care** possible. [H]e is entitled to reasonable measures to meet a substantial risk of serious harm to h[im]." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). Mr. Harral "is not entitled to demand specific care." *Id*. Here, the defendants took proper measures to meet a substantial risk of serious harm to his health. More specifically, the defendants prescribed Neurontin, Ultram, and Wellbutrin to treat Mr. Harral's neuropathy and associated pain and his depression. However, Mr. Harral diverted Neurontin (on two occasions) and Ultram and later tested positive for Suboxone. As such, these medications were terminated pursuant to IDOC policy. However, the defendants did not leave Mr. Harral without any care. In fact, APN Dawson offered Mr. Harral Effexor, Prozac, Celexa, Zoloft, Pamelor, Tofranil, and Remeron for his depression, but he refused them all. Similarly, Mr. Harral was prescribed other medications for pain, just not Neurontin, Ultram, and Wellbutrin. [Dkt. 47-1, ¶ 27]. Mr. Harral refused all of the alternative pain medications without allowing sufficient time to allow for pain control. [Dkt. 47-1, ¶ 52].

Here, the record reflects that medical staff had a reasonable basis for terminating Mr. Harral's prescriptions for narcotics and switching them to non-narcotics. Mr. Harral has a history of polysubstance abuse and ingested the drug Suboxone, which was contraband. Under these circumstances, withholding Neurontin, Ultram, and Wellbutrin does not amount to deliberate indifference and Mr. Harral has not shown that he is likely to succeed on the merits of his claim.

### B. Irreparable Harm

"Irreparable harm is harm which cannot be repaired, retrieved, put down again, atoned for.... [T]he injury must be of a particular nature, so that compensation in money cannot atone for it." *Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 196 (7th Cir. 1997). Here, defendants argue that Mr. Harral cannot show an actual injury or imminent irreparable injury because he was offered numerous alternative medications and his medical conditions (pain and depression) are being monitored regularly. Mr. Harral has not presented any evidence to rebut this showing. The Court agrees that Mr. Harral's health is not at immediate risk because he is not being prescribed Neurontin, Ultram, and Wellbutrin.

### C. Balance of Harms

Because Mr. Harral seeks injunctive relief, he has the burden of proving by a clear showing that a balancing of the equities falls in his favor. *Mazurek* 520 U.S. at 972. Mr. Harral does not address this factor. Rather, he alleges he needs to take Wellbutrin because it is the only medicine that has been effective in the past. However, the facts simply do not bear this out. Mr. Harral was offered multiple other drugs for his nerve pain and depression. However, he refused to either take them or to allow sufficient time for pain control. Moreover, giving addictive medications to a patient with a demonstrated history of noncompliance, such as Mr. Harral, invites relapse with deleterious effect on his health.

At this time, Mr. Harral's allegations of pain and mental illness do not support a conclusion that he needs immediate treatment in the form of narcotic or other opioid based medications.

### D. Public Interest

Mr. Harral also does not address this factor. The defendants argue that the public interest is in their favor to the extent that prisons should be given deference as to the day to day

11

maintenance and medical care of the inmates. The Court agrees that the defendants should be accorded deference at this time to provide the most appropriate medical treatment and medications for Mr. Harral's depression and pain.

The Seventh Circuit has previously stated that, ". . . federal courts are most reluctant to interfere with the internal administration of state prisons because they are less qualified to do so than prison authorities." *See Thomas v. Ramos*, 130 F.3d 754, 764 (7th Cir.1997). As the Supreme Court has stated:

> The problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. 'Such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgments in such matters.'

*See Bell v. Wolfish*, 441 U.S. 520, 547-48 (1979) (quoting *Pell v. Procunier*, 417 U.S. 817, 827) (1979) (citations and footnotes omitted).

A prison medical professional's "treatment decisions will be accorded deference unless no minimally competent professional would have so responded under those circumstances." *Jackson v. Kotter*, 541 F.3d 688, 698 (7th Cir. 2008)(internal quotations omitted).

## IV. Conclusion

For the foregoing reasons, Mr. Harral has not shown he is entitled to preliminary injunctive relief. Accordingly, his motion for a preliminary injunction [dkt. 37] is **denied**.

**IT IS SO ORDERED.**

Date: 2/28/17

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

12

Distribution:

Carol A. Dillon
BLEEKE DILLON CRANDALL, P.C.
carol@bleekedilloncrandall.com

JAMES D. HARRAL, JR.
100326
PUTNAMVILLE - CF
PUTNAMVILLE CORRECTIONAL FACILITY
Electronic Service Participant – Court Only